**UNITED STATES of America,
Plaintiff,**

v.

**Lester GROOMS et al., Defendants.**

**Civ. No. 71–94.**

United States District Court,
M. D. Florida,
Orlando Division.

July 28, 1972.

Martin Barenblat, U. S. Dept. of Justice, Washington, D. C., for plaintiff.

Charles L. Steinberg, Orlando, Fla., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND DECREE

GEORGE C. YOUNG, District Judge.

The United States instituted this action on May 3, 1971, pursuant to 42 U. S.C. § 3613, for injunctive relief against alleged discrimination in housing by the owners and operators of four mobile home parks located in the Titusville and Mims, Florida area. The Complaint alleges that the defendants have engaged in a pattern and practice of discrimination in housing, individually and collectively. The Complaint also alleges that the defendants have denied equal housing opportunities to a group of persons under circumstances of general public importance. Prior to trial, this action was resolved by consent as to three mobile home parks.

The remaining defendants, Lester Grooms, Shirley Grooms, Sterald Latimer, and Northgate Properties Incorporated of Titusville, d/b/a Northgate Mobile Home Ranch (hereinafter Northgate defendants) denied discrimination and contended that mobile home parks were not subject to the provisions of the Fair Housing Act, 42 U.S.C. § 3601 et seq. On June 12, 1972, the Northgate defendants filed a motion for a continuance alleging as grounds therefor the illness of Sterald Latimer, who is part owner of Northgate but lives in Cincinnati, Ohio. On June 15, 1972, the United States agreed to dismiss the action as to Latimer individually, and the Court denied defendants' motion for a continuance since Latimer was not an essential witness, and his personal appearance at the trial was not necessary for a proper determination of the issues. On June 26, 1972, trial was held in Orlando, Florida as to the Northgate defendants.

The Court, having considered the testimony and documentary evidence, and the contentions of counsel for both parties, now makes the following:

## FINDINGS OF FACT

(1) Northgate Mobile Home Ranch (hereinafter Northgate), which is located on United States Highway 1, Mims, Florida, is owned by Northgate Properties Incorporated of Titusville, a Florida corporation (Pre-trial Stipulation, p. 7). Since June 1969, Lester Grooms and Sterald Latimer have each owned fifty percent of the stock of Northgate Properties Incorporated of Titusville, and the officers of this corporation have been Sterald Latimer, President, Lester Grooms, Vice-President, and Shirley Grooms, Secretary and Treasurer (Deposition of Lester Grooms, pp. 37–39). Lester Grooms and Shirley Grooms are responsible for the daily operation and management of Northgate. There are no other employees at Northgate (Deposition of Lester Grooms, pp. 40, 74 and his trial testimony).

(2) Northgate is divided into a rental section consisting of approximately 175 mobile home sites, a second section in which there are about 70 mobile home sites available for sale, and a third "overnight" section with about fifty spaces (Testimony of Lester Grooms). The mobile home sites in the rental section rent for $28.50 per month (Deposition of Lester Grooms, pp. 43–45 and his trial testimony). Since Northgate was developed and began operation in 1965, there have always been numerous vacancies in the rental section (Deposition of Lester Grooms, pp. 47–48, and his trial testimony).

(3) Northgate provides a swimming pool, Clubhouse, and recreational area for the use and enjoyment of its tenants and their guests and has laundry facilities available for use by residents

(Testimony of Lester Grooms, Defendants' Exhibit No. 1). In living at Northgate, the residents necessarily sacrifice some privacy. Due to the proximity of the mobile homes to each other, residents share common yard areas and noise and conversations may be overheard by neighbors (Deposition of Lester Grooms, p. 84, and his trial testimony).

(4) During the summer of 1970, Mr. and Mrs. Foy Williams, who are black residents of Mims, considered moving to a mobile home park. They found a mobile home they wanted to purchase and had gone to a bank to arrange financing (Stipulation—Testimony of Bob Cooper).

The Williams then went to Northgate to inquire about renting a site there. They first talked to Mrs. Grooms, who told them they would have to see her husband. They eventually talked to Mr. Grooms, who told them, apparently in response to a question from Mrs. Williams about whether they would be accepted, that he had never rented to blacks before. Mr. Grooms also told the Williams that they would have to obtain three references of persons living at Northgate. Mr. Williams knew one occupant of Northgate, by sight but not by name. This man was not at home. The Williams made no further attempt to obtain references from incumbent tenants.

(5) On the same day as their visit to Northgate, the Williams went to a mobile home park located in Scottsmoor, Florida. The owner of this park told them there had never been blacks in residence but appeared to be willing to rent a site to them. At that time Mrs. Williams was driving a school bus. She estimated that she would have to get up 1½ hours earlier if she moved to this park. She also claims to have been discouraged when the owner told her she would have to keep her pet dog quiet. Since the actual distance between this park and Mims is five miles, 1½ hours was an inaccurate estimate and was not, as claimed by her, a valid reason for not renting there.

(6) Reverend Arthur Lee McCreary, a black evangelist preacher, came to Mims, Florida at the end of November 1970 with a mobile home but no place to put it. During December 1970 he began to look for a site. After unsuccessful efforts to rent a site at several local parks, McCreary contacted Mr. Grooms at Northgate. Mr. Grooms told him that he would have to obtain recommendations from two residents of Northgate.

Reverend McCreary obtained letters of recommendation from a former white resident of Northgate and from a local minister. Reverend McCreary returned to Northgate, but Mrs. Grooms refused to rent a site to him.

Reverend McCreary testified that Mrs. Grooms told him she had talked to her lawyer and that the lawyer had said "Let's face it, he can't move in; it would only be the end of us." Reverend McCreary also testified that when he asked Mrs. Grooms if it was because he was black, she responded, "Yes, because you are black".

Mrs. Grooms, at deposition (Deposition of Shirley Grooms, pp. 50–51) and initially at trial, denied any recollection of telling either Reverend McCreary or the FBI that she was acting on advice of counsel. After being confronted at trial with contrary testimony by an FBI agent (Special Agent Donald Ritchey testified that when he questioned Mrs. Grooms about the McCreary incident, she refused to answer questions, relating that any action she had taken was on the express advice of counsel), Mrs. Grooms acknowledged that she had told McCreary that her lawyer advised her she had the right to rent to anyone she wanted and a right not to rent to him.

(7) The Court takes judicial notice of the fact that it is difficult for any prospective resident, white or black,

to obtain recommendations from incumbent residents of the mobile home park when he does not know any. Stipulated testimony was received in this case from sixteen white residents of Northgate. All of them had been routinely admitted at the time of application, and none had been required either to secure recommendations from incumbent tenants or to provide recommendations to others.

(8) The defendants testified that they followed a nondiscriminatory policy, and denied that their treatment of the Williams or McCreary was based on race. Defendants testified that while no investigation is made of the qualifications of some applicants, particularly if they have bought a mobile home from a known dealer, more extensive inquiry is sometimes made, including requests for recommendation from tenants, if defendants subjectively feel that the applicant may not be a "congenial" tenant. The Court finds, however, that as applied, this policy, regardless of its motivation, has had the effect of discriminating on account of race.

(9) The Court finds that there were nonracial circumstances which would have justified refusal to rent to Reverend McCreary. The prayer meeting planned for his mobile home might have been most disturbing. In addition, Reverend McCreary has never paid Mr. Grooms $55.00 for moving his mobile home and has never obtained Florida "tags" for his mobile home. Reverend McCreary's failure to satisfy these obligations, while not conclusive, would have been sufficient reasons for an owner to decide that he did not want to have him in his park. However, the existence of some of these nonracial grounds could not have been known to defendants when they rejected Reverend McCreary (While Reverend McCreary did not have Florida "tags", he had then only just moved to Florida. The debt of $55.00 was contracted after McCreary's rejection, and, before his application to Northgate, Reverend McCreary had paid Mr.

Grooms for putting blocks under his mobile home.), and does not impair the conclusion that Reverend McCreary made a bona fide offer and was rejected as part of a pattern or policy of refusal to rent to blacks.

CONCLUSIONS OF LAW

(1) This Court has jurisdiction of this action under 28 U.S.C. § 1345 and 42 U.S.C. § 3613.

(2) 42 U.S.C. § 3602(b) defines a dwelling as "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof." Under applicable rules of construction, this necessarily includes a mobile home site. See United States v. Perry Parks, Inc., No. 71–407 (D.S.C. December 15, 1971) (Consent Decree); United States v. Continental Construction Co., et al., C.A. No. 1526 (E.D.N.C. June 8, 1972) (Consent Decree).

(3) To prove an individual "pattern and practice" the Government is required to show that any discriminatory act by the defendants was not an isolated, accidental or peculiar departure from a nondiscriminatory norm. United States v. Reddoch, No. 6541–71–P (S.D.Ala. January 27, 1972) and see the authorities defining pattern or practice there collected. Any course of conduct or way of doing business which actually or predictably results in different treatment of whites and blacks is a discriminatory pattern or practice, irrespective of motivation. United States v. Reddoch, *supra*; United States v. Medical Society of South Carolina, 298 F.Supp. 145, 152 (D.S.C.1969).

(4) The Fair Housing Act, like other civil rights laws, prohibits conduct

## 1134

with discriminatory consequences as well as discriminatorily motivated practices.

■ (5) This Court recognizes that the defendants have the right to formulate and implement reasonable, objective, and nonracial rental standards and procedures, and to inquire into the background and habits of prospective tenants and their ability to pay the rent. Such standards and procedures are necessary in order for the defendants to operate and maintain a decent mobile home park and should be geared to meet the special circumstances involved when residents live in close proximity to each other and share common facilities. A requirement that prospective tenants obtain recommendations that are reasonably obtainable may properly be used as a procedure for securing information about prospective tenants. Moreover, persons as to whom necessary information is objectively available without references need not be screened in this way, so long as no racial discrimination results either in processing or in admission to the park.

(6) Procedures for evaluating applicants should, however, be as objective and uniform as possible, especially where, as here, defendants have never rented to blacks.

■ (7) The evidence shows that the Northgate defendants have engaged in an individual pattern or practice of resistance to the full enjoyment of rights secured by the Fair Housing Act of 1968, 42 U.S.C. § 3601 et seq. It is, therefore, unnecessary for the Court to consider either whether the Northgate defendants have denied to a group of persons the rights granted by the Fair Housing Act, which denial raises an issue of general public importance, United States v. Reddoch, *supra*; United States v. Hunter, 459 F.2d 205 (4th Cir. 1972), aff'g 324 F.Supp. 529 (D.Md. 1971), or whether the Northgate defendants have collectively with other defendants and non-parties, engaged in a pattern or practice of resistance to the full enjoyment of rights granted by the Fair Housing Act.