Carroll McHANEY, Jr., and Wife, Mary L. McHaney, Plaintiffs,

v.

Harry SPEARS, L. R. Mitchell and Mutual Development Co., Defendants.

No. C–81–1003.

United States District Court, W. D. Tennessee, E. D.

Nov. 20, 1981.

Jerry Charles Cox, Jackson, Tenn., Richard Fields, Ratner & Sugarmon, Memphis, Tenn., for plaintiffs.

James F. Butler, Goodrich, Butler & Morgan, Jackson, Tenn., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

HORTON, District Judge.

The issue in this lawsuit is whether the defendants rejected and refused to accept plaintiffs' offer to purchase a parcel of real estate, identified as Lot 20, Double Bridge Subdivision, Section 2, Jackson, Tennessee, because of the plaintiffs' race. The Court finds from all of the credible evidence in the record and concludes that plaintiffs have proved, by a clear preponderance of the evidence, that the defendants did reject and refused to accept their offer to purchase Lot 20 because they are black persons in violation of the Fair Housing Act, Title VIII of the Civil Rights Act of 1968 and 42 U.S.C., § 1982.

### FINDINGS OF FACT

1. Plaintiffs, Carroll McHaney, Jr. and wife, Mary L. McHaney are black citizens of the United States and the State of Tennessee residing in the city of Jackson, Tennessee. Mr. McHaney was a teacher in the Chester County, Tennessee school system for seven (7) years and, at the time of trial, had worked for one (1) year helping locate employment for disadvantaged young people. Plaintiff Mary L. McHaney is a school teacher.

2. The defendants Harry Spears and L. R. Mitchell, are real estate developers and officers in Mutual Development Corporation. Mr. Spears is President of the corporation. Mr. Mitchell is Vice-President. The primary purpose of the corporation is to develop, improve, lease, sell and mortgage real estate and otherwise engage in all aspects of real estate management and development. Both Spears and Mitchell are white persons.

3. James P. Murdaugh is a white duly licensed real estate broker and appraiser. Since May of 1974, Mr. Murdaugh has engaged in the real estate business in Jackson, Tennessee. His business is Golden Circle Land Company, Inc.

4. On or about December 1, 1980, plaintiffs contacted James P. Murdaugh and engaged his services as a real estate agent. Plaintiffs informed Murdaugh that they were interested in purchasing a lot in Jackson, Tennessee, for the purpose of building a home. They were specifically interested in Lot 20, Double Bridge Subdivision, Section 2, on Windy Hill Road in Jackson, Tennessee. At that time, plaintiff Carroll McHaney was employed in the Chester County School System, Henderson, Tennessee.

5. Murdaugh looked at the lot, saw a "For Sale" sign on it listing telephone numbers. One of the telephone numbers was that of defendant Harry Spears. Murdaugh researched the subdivision in the City of Jackson tax office. He learned the lot was owned by Mutual Development Company and that defendants Spears and Mitchell were officers in that company.

6. Murdaugh telephoned Spears on or about December 9, 1980 and discussed the lot with him. Spears informed Murdaugh they wanted to net $8,500.00 for that lot, that the normal real estate commission was $500.00 and that the sale price would be $9,000.00. Spears informed Murdaugh the lot was for sale during that conversation. Murdaugh informed Spears that he had interested clients, people who wanted to build a home on the lot. They would have no problem meeting the subdivision's restric-

tions and would apply to First Federal Savings and Loan Association, (First Federal), Jackson, Tennessee, for a Federal Housing Administration (FHA) loan contract.

7. On or about December 10, 1980, Murdaugh informed McHaney of the $9,000.00 price for the lot. McHaney asked Murdaugh to get a contract. Murdaugh thereafter telephoned Spears and informed him that his client was willing to pay the $9,000.00 and Spears informed Murdaugh, at some point, that the subdivision was not an FHA approved subdivision. However, Murdaugh indicated that was no problem as a single lot in a subdivision could be FHA approved.

8. On about December 11, 1980, Murdaugh drafted a contract which was signed by the plaintiffs. An earnest money check in the sum of $1,000 payable to Golden Circle Land Company was also signed. Both contract and check are dated December 12, 1980. The contract provided that the purchase was subject to an FHA construction loan of $57,500.00 through First Federal.

9. Murdaugh telephoned Spears on December 12, 1980, told him that he had a contract and arranged to meet Spears at Spears' daughter's home. When he met with Spears, he handed Spears the contract with the check attached. They discussed the contract terms such as purchase price, earnest money deposit, what the conditions were and reflected a closing date of on or before February 15, 1981. Spears took the contract, read it and asked me how to sign it. It was Murdaugh's understanding that Spears was ready to sign, the only question being that plans and specifications would be approved by Spears and Mitchell. However, Spears did not sign the contract. He hesitated, then asked Murdaugh:

"Jim, are these people white?"

Murdaugh replied:

"No sir"

Spears said:

"I just don't know, I will have to talk to Mitchell. We've never sold to Blacks, we've avoided the issue."

Spears stated that he would have to get with Mitchell and would get back with Murdaugh. Murdaugh gave Spears a business card and Spears handed the contract and pen back to Murdaugh. The contract was not signed. Murdaugh informed Spears that Spears could not turn the contract down because the people were not white, that he, Murdaugh, was placed in an ethical position where he could not say the situation did not come up.

10. On December 15, 1980, Murdaugh telephoned Spears and inquired if Spears and Mitchell had reached a decision. Spears informed Murdaugh that he had talked with an attorney who informed him that he did not have to sell a lot to anyone he did not want to.

11. On April 27, 1981, Murdaugh had a conversation with L. R. Mitchell, a business associate of Spears and Vice-President of Mutual Development Company. Mitchell stated to Murdaugh that Murdaugh could have protected him better, handled the matter better and not drag them into this situation. Murdaugh informed Mitchell that ethically and being a real estate agent, he had guidelines to follow and was just stating the facts as they occurred—as it meant nothing to him one way or the other.

12. Lot 20, Double Bridge Subdivision, Section 2, Windy Hill Road, Jackson, Tennessee, was at the time for sale and a "For Sale" sign was on the lot carrying the telephone numbers of Spears and Mitchell.

13. Spears admitted that he did not ask Murdaugh who his clients were and that Murdaugh told him they were a Black couple and that they were school teachers. Spears denied that he ever commented about race.

14. Spears admitted that Murdaugh telephoned him and he informed Murdaugh that he and Mitchell had decided not to sell the lot.

15. From June 23, 1980, to December 10, 1980, ten lots were sold by Spears and Mitchell in the Double Bridge Subdivision. All of the sales were to white purchasers. Two of the sales occurred in December, 1980, the month plaintiffs were attempting

to purchase lot 20. Those two sales were of lot 21 on December 3, 1980, and lot 23 on December 10, 1980.

16. No Black persons live in the Double Bridge Subdivision.

17. Mitchell discussed the possibility of employing plaintiff Carroll McHaney's father. During the course of that conversation, Mitchell admitted that he mentioned the lawsuit to McHaney's father and stated to him, in substance:

> If you could see fit to speak to your son and see if this thing could be disposed of other than by the process of litigation.

Mitchell never did employ the father and did not recall what the father's response was to his request to get the son to, in effect, drop the lawsuit.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of this case under 42 U.S.C. § 3601 *et seq.*; 42 U.S.C. §§ 1981 and 1982; 28 U.S.C. § 1343(3) and (4); 28 U.S.C. § 2201; and 42 U.S.C. § 3612(a).

2. The Fair Housing Act, enacted as Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601–3631 (1976) makes it unlawful for any person to refuse to sell or otherwise make unavailable a dwelling to any person because of race. Section 3604(a) of 42 U.S.C., provides in pertinent part as follows:

> [I]t shall be unlawful—
>
> (a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.

Section 3602(b) of 42 U.S.C. includes vacant land in the definition of the word "Dwelling".

> (b) 'Dwelling' means . . . any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof.

The Act itself clearly delineates its purpose and policy, "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. The Act implements this policy by declaring unlawful any refusal to sell or otherwise make unavailable a dwelling to any person because of race. *Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032 (2nd Cir. 1979).

The plaintiffs allege that the defendants refused to sell Lot 20 to them because they are black. Such action by the defendants, so assert the plaintiffs, establishes a violation of Title VIII, of the Civil Rights Act of 1968. Whether a plaintiff has established, prima facie, a violation of the Act requires a showing:

(1) that the plaintiff is a member of a racial minority;

(2) that plaintiff applied for or was qualified to rent or purchase the vacant land;

(3) that plaintiff was rejected; and

(4) that the opportunity to purchase the vacant land remained open.

*See, Phiffer v. Proud Parrot Motor Hotel, Inc.*, 648 F.2d 548, 551 (9th Cir. 1980); *Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1038 (2nd Cir. 1979); *Wharton v. Knefel*, 562 F.2d 550, 553–54 (8th Cir. 1977); *Smith v. Anchor Building Corp.*, 536 F.2d 231, 233 (8th Cir. 1976); *Williams v. Matthews Co.*, 499 F.2d 819, 826 (8th Cir. 1974), *cert. denied*, 419 U.S. 1021, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974); *cf., McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

The evidence in this record indicates that, on December 12, 1980, McHaney, through his agent, Murdaugh, made the defendants an offer on Lot 20. The terms of the offer included an initial deposit of $1,000.00 by the plaintiffs as earnest money, with the balance to be paid upon obtaining FHA loan approval of the site. On December 15, 1980, the defendants finally rejected plaintiffs offer due to reasons of race and the lot remained available for subsequent purchase. Defendant Spears' statement to

Murdaugh that they would sell their property to whomever they pleased, but not to the plaintiffs, evidences defendants' continuing intention to sell the lot. Thus, the plaintiffs have established the elements necessary to prove a prima facie violation of the Act.

■ In response to the McHaneys' claim of discrimination, the defendants assert that their refusal of the plaintiffs' offer had nothing whatsoever to do with race, but was instead because the plaintiffs' offer did not conform with the business policies and practices of the defendants. It should be remembered, however, that Courts dealing with alleged violations of Title VIII also have determined that "policies and practices may violate the Act if there is a showing of a racially discriminatory effect, even absent evidence of a racially discriminatory motive." *United States v. City of Parma, Ohio,* 494 F.Supp. 1049 (N.D.Ohio 1980). The Eighth Circuit in *United States v. City of Black Jack,* 508 F.2d 1179 (8th Cir. 1974, cert. denied, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975), stated that:

> [T]he plaintiff need prove no more than that the conduct of the defendant actually or predictably results in racial discrimination; in other words that it has a discriminatory effect . . . [t]he plaintiff need make no showing whatsoever that the action resulting in racial discrimination in housing was racially motivated . . . [e]ffect, and not motivation, is the touchstone, in part because clever men may easily conceal their motivations. . . .

*Id.* at 1184–85 (citations and footnotes omitted). Consequently, plaintiffs may establish a prima facie violation of Title VIII by proving that the defendants policies and practices had the effect of segregating the Double Bridge subdivision in Jackson, Tennessee.

■ Once the plaintiffs have established a prima facie violation of the Act, the inquiry does not end. The burden then shifts to the defendants to present evidence in support of their assertion that the actions taken were not motivated by racial prejudice. Otherwise, the plaintiffs will be entitled to relief. *Robinson v. 12 Lofts Realty, Inc., supra,* at 1039; *United States v. City of Parma, Ohio, supra,* at 1049. Upon due consideration of the reasons given by the defendants for their refusal to sell Lot 20 to the McHaneys, the Court does not believe that the defendants have satisfied this burden.

The defendants have advanced three primary justifications for their position that they did not discriminate against the plaintiffs on the basis of their race. *First,* the defendants insist that it was their policy to sell lots on a "cash only" basis. *Second,* the defendants assert that it was their practice to require the purchasers of lots to agree to allow their son or son-in-law to build the homes placed on the lots. *Third,* the defendants allege that they had only six lots left and they wanted to keep those lots for themselves and their families. Additionally, the defendants urge the Court to take notice of their prior sales record, which they allege indicates that they have sold houses to blacks in predominately white neighborhoods. This they assert is evidence of their non-prejudicial attitude toward blacks and integrated neighborhoods.

The Court finds that although there is evidence in the record to indicate that the defendants sold many of the lots on a cash basis, that fact alone is not determinative in this case. "The specific sequence of events leading up to the challenged decision may shed some light on the decision maker's purpose." *Village of Arlington Heights v. Metropolitan Development Corp.,* 429 U.S. 252, 267, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977). On December 10, 1980, James P. Murdaugh, agent for the plaintiffs, advised defendant, Spears, by telephone that the plaintiffs agreed to pay the $9,000.00 purchase price for Lot 20. At that time, Murdaugh explained to Spears the terms of the contract he had drawn up formalizing the agreement between the parties. The defendants voiced no objections to the terms described by Murdaugh. On December 12, 1980, Murdaugh and Spears met to sign the contract of sale. Once again, the parties discussed the terms of the contract. The

testimony of Murdaugh is unequivocal. Spears did not voice any objection to the terms of the contract. It was only after Spears inquired about the race of Murdaugh's clients, did he learn that they were black. And it was after learning the prospective purchasers were black that Spears refused to sign the contract or find the terms of the offer unacceptable. Although the defendants testified they found the terms of the plaintiffs' offer objectionable, at no time did the defendants suggest to the plaintiffs any terms that they found more to their satisfaction. This fact is of particular significance since the parties had reached a mutual agreement regarding the purchase price to be paid for Lot 20 and all that was left for determination was when and how the money would be paid. The Court finds from the absence of a counter-offer on the part of the defendants, that in reality, the defendants did not want to sell to the plaintiffs on any terms, and that their refusal to sell was based upon the race of the plaintiffs and evidences their intent to discriminate on the basis of race in the sale of lots in the Double Bridge Subdivision.

The defendants also assert that plaintiffs offer was unacceptable because it did not provide for the defendants son or son-in-law to build the house to be erected on lot 20. The Court finds this assertion to be a mere pretext, wholly lacking in justification since the defendants did not inform the plaintiffs, at any time, that should they buy Lot 20 the defendants' son or son-in-law must be permitted to build their house. The defendants never inquired of plaintiffs whether this condition was acceptable, nor did defendants make plaintiffs any such counter-offer.

Also included in the justification proffered by the defendants is the allegation that, the defendants had only six lots left, which they wanted to keep for themselves and their family. Although, this could certainly be a valid business reason for the defendants not wanting to sell their property to plaintiffs, the Court must examine such reasons with prudence.

[I]n evaluating the proposed justifications, the district court must carefully scrutinize suggested reasons that are not objective in nature. In cases in which discriminatory intent could be inferred from the sequence of events, the courts have generally viewed subjective explanations with considerable skepticism. The wisdom in such skepticism is obvious. 'Any defendant can respond to a discriminatory effect with a claim of some subjective preference or prerogative and, if such assertions are accepted, prevail in virtually every case.'

*Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d at 1040 (citation omitted). The Court believes that the evidence offered at trial sheds light upon the question of whether the defendants had a valid and sincere desire to keep the six lots for themselves. On Monday, December 8, 1980, Murdaugh, plaintiffs' agent, first inquired, by telephone regarding the availability of Lot 20. He was informed the lot was for sale and at the price of $9,000.00. A "For Sale" sign was on the lot with defendants' telephone numbers on it. The defendants made no mention of their intention to keep the lot for themselves. The defendants' assertion that they intended to keep the remaining six lots is made even more suspect since the defendants sold Lot 21 in that same subdivision two days later, Wednesday, December 10, 1980. Additionally, both of the defendants have built homes and live in the Double-Bridge subdivision, along with many of their relatives. Thus, it would seem that the defendants were not keeping the lots for themselves. Clearly, the actions of the defendants refute any stated intention they may have had to keep the lots.

Finally, the defendants contend that on the basis of their prior real estate sales record in the Jackson area this Court should find that they are not opposed to the sale of property to blacks in predominately white areas. Both Mr. Spears and his wife, Mrs. Lorene Spears, a licensed real estate agent, testified that in the past they have either rented or sold houses to blacks in predominately white neighborhoods in the Jackson area. Once again, however, the Court must

approach such evidence with caution. "Where the evidence so clearly speaks to racial exclusion in a particular instance . . . evidence of prior nondiscriminatory conduct may properly be found not to constitute a valid defense." *Phiffer v. Proud Parrot Motor Hotel, Inc.* 648 F.2d at 552. Regardless of what the defendants dispositions may have been in the past regarding the sale of realty to blacks in white areas, the overwhelming weight of the evidence in this case indicates that the defendants had Lot 20 for sale at a price of $9,000.00 and that the defendants were not willing to sell Lot 20 to the plaintiffs because they were black. The evidence indicates that Spears told Murdaugh that defendants had avoided selling to blacks in the past. The record indicates that the defendants had sold none of the lots in the subdivision to blacks. Additionally, testimony at trial indicates that the defendants had berated Murdaugh, a white man, prior to the trial, for not handling the matter better.

This Court carefully observed the demeanor of the witness James P. Murdaugh while on the witness stand and the manner in which he testified. The facts in evidence corroborate his testimony as being truthful. The overwhelming weight of the evidence supports his testimony. The Court judges his credibility to be extremely high. His testimony is convincing to the Court.

The defendants, while holding out the possibility of construction work, also approached Mr. McHaney's father and urged him to talk to his son about dropping this lawsuit. When combined, the sum total of all the evidence preponderates strongly in favor of the plaintiffs, and leads to an inescapable conclusion that the defendants unlawfully denied sale of Lot 20 to the plaintiffs on the basis of their race in violation of Title VIII.

The present case is not unlike *Williams v. Matthews Co.*, 499 F.2d 819 (8th Cir. 1974). In *Williams,* the plaintiffs, black resident of Little Rock, Arkansas, brought an action charging the defendants with racial discrimination in refusing to sell residential building lots to black people in violation of Title VIII and 1982. As in the present case, the defendant proffered several business justifications for not selling to the plaintiffs. Primarily, in *Williams,* the defendants claimed that it was their policy to sell lots only to approved builders rather than individual buyers. The defendant alleged that this policy insured the orderly growth and development of the subdivision. The Eighth Circuit held that this justification while "fair in form, is discriminatory in operation." *Williams, supra* at 828. The Court also expressed its opinion that the defendants' procedure of selling lots only to builders, and then, only to builders who met its approval was "fraught with racial overtones" insufficient to overcome the prima facie case established by the plaintiffs. *Id.* Similarly, this Court finds that in this case the defendants' practice of selling lots only for cash and then only if their son or son-in-law built the homes has the same tinge of racism that the Eighth Circuit found objectionable in *Williams.* In this case these practices would disqualify many minority applicants in the Jackson area who could purchase lots with FHA approval and financial help. Also, once the purchasers overcome the burden of meeting the defendants' price in cash, they are forced to come to terms with the defendants' son or son-in-law regarding the price the purchaser will pay to have their home built. Thus, the prospective purchaser may be eliminated because, (1) he cannot pay cash for the lot initially, although he may be able to purchase it after receiving FHA assistance, and/or, (2) he may be unable to meet the price asked by the defendants' son or son-in-law for building his home. The Court in *Williams* suggested that in assessing business justifications offered by the defendant, a court should remember:

> Recent cases make clear that the statutes prohibit all forms of discrimination, sophisticated as well as simple-minded, and thus disparity of treatment between whites and blacks, burdensome application procedures, and tactics of delay, hindrance, and special treatment must receive short shrift from the courts . . .

[t]he courts will look beyond the form of a transaction to its substance and proscribe practices which actually or predictably result in racial discrimination, irrespective of defendant's motivation.

499 F.2d at 826. Accordingly, this Court finds that defendants' practices as applied in the context of this case discriminatorily impacted upon minority purchasers.

Another decision of importance in this area is *Harper v. Hutton*, 594 F.2d 1091 (6th Cir. 1979). In *Harper*, the plaintiffs, young black college students, were refused rental of an apartment near the Vanderbilt University campus. The landlord alleged that he refused to rent to the young couple because they were scholarship students on a tight budget and he did not think that they could meet the rental obligation. The defendant also stated that he did not think that lease breakers (plaintiffs would break their present lease to move into defendant's apartment) make good tenants. The Sixth Circuit reversed the district court's determination that the defendant had just cause for refusing to rent to the plaintiffs. The Court of Appeals reviewed the entire record and concluded that defendants' business judgment excuse was simply a pretext. After reviewing the testimony given at the trial and the entire record in this case, the Court determines that the business reasons offered by Spears and Mitchell are simply pretextual.

■ Even assuming that Spears' and Mitchell's alleged business justifications played a part in their decision not to sell Lot 20 to plaintiffs, this fact alone does not vindicate the defendants of all wrongdoing. If the race of the McHaneys was also a factor defendants considered, then defendants violated the Act and Section 1982. As the Eighth Circuit states in *Williams, supra.*

Race is an impermissible factor in real estate transactions under both 42 U.S.C. § 1982 and 42 U.S.C. § 3604 and 'cannot be brushed aside because it was neither the sole reason for discrimination nor the total factor of discrimination.'

499 F.2d at 826. (Quoting, *Smith v. Sol D. Adler Realty*, 436 F.2d 344, 349–50 (7th Cir. 1970).

This Court is of the opinion that race was, indeed, a factor considered by the defendants. The record indicates that on December 12, 1980, Spears was ready to sign the contract of sale for Lot 20 until he learned that the prospective purchasers were black. Clearly, that the McHaneys were black was the overriding consideration in the defendants' minds. Irrespective of the presence of other factors motivating the defendants refusal, they cannot under the relevant statutory provisions justify racial discrimination. *Payne v. Bracher*, 582 F.2d 17, 18 (5th Cir. 1978).

■ The plaintiffs have also alleged that the defendants' actions state a cause of action under 42 U.S.C. § 1982. The Court finds that the requirements necessary to establish a prima facie case, and carry the burden of proof is the same under this provision as it is under 42 U.S.C. § 3601 *et seq.* Accordingly, the Court finds that the defendants are liable to the plaintiffs for their violation of Section 1982 based on the findings of fact and the conclusions of law discussed in this opinion.

It is therefore, by the Court

ORDERED that judgment is hereby rendered for the plaintiffs on both their claim under Title VIII of the Civil Rights Act of 1968, the Fair Housing Act, 42 U.S.C. 3601–3631 (1976) and Section 1982 of 42 U.S.C.

The Court will retain jurisdiction of the case pending resolution of matters pertaining to damages that should be awarded plaintiffs, attorney's fees and costs. The Court recommends that counsel for both parties meet within 15 days of this order and decide if these remaining issues can be resolved by the parties. In order to be helpful, the Court advises counsel that the final decree in this case will in a proper way require the defendants to honor the contract and convey Lot 20, Double Bridge Subdivision Section 2, to the plaintiffs and will enjoin the defendants from discriminating against prospective purchasers of lots in the Double Bridge Subdivision because of race. If the remaining matters cannot be

resolved by counsel for the parties, in consultation with their clients, within 15 days from the date of this order, the Court will then decide what steps should be taken to finally resolve the case and enter an appropriate decree.