Sandra L. HOBSON, et al., Plaintiffs,

v.

GEORGE HUMPHREYS, INC., et al., Defendants.

Civ. A. No. 82–2281–H.

United States District Court,
W.D. Tennessee, W.D.

Sept. 27, 1982.

On Attorney's Fees and Costs
Dec. 6, 1982.

Thomas M. Daniel, Memphis, Tenn., for plaintiffs.

Clare M. Orman, William M. Walsh, Memphis, Tenn., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, ORDER

HORTON, District Judge.

This suit was initiated by two black women, Sandra C. Hobson and Clarese Hobson, against George Humphreys, Inc., a real estate agency, George Humphreys, individually, a real estate broker, and Robert Maxwell Williams, executor of the estate of his daughter, Linda S. Leeming, alleging a violation of the Fair Housing Act, 42 U.S.C. Section 3604 et seq., and the Civil Rights Act of 1866, 42 U.S.C. Section 1982. The case was tried, without a jury, on June 3, 1982, and, pursuant to Rule 65 of the Feder-

al Rules of Civil Procedure, evidence previously received upon the application for a preliminary injunction was made part of the trial record.

The issue in this lawsuit is whether the defendants discriminated against the plaintiffs because of their race as to the terms and conditions of the proposed sale of a condominium located at 2954 Southern Avenue, Memphis, Tennessee. The defendant, Robert Williams, owner of the property at 2954 Southern Avenue, asserted that he was not involved in any discrimination against the plaintiffs and he rejected their first offer to purchase the property because it was insufficient. Mr. Williams stated the asking price was what he preferred to receive for the property but he had decided to accept a lower price if it would net him $70,000. The original listing price was $79,500. The plaintiffs' offer to the defendant was below either of the above stated figures. Defendant George Humphreys, Inc., and George Humphreys were agents for the owner of the property. The terms of the listing agreement called for a sale price of $79,500 all cash at closing. If the listing price could not be obtained, the owner would accept a figure that would net $70,000. Humphreys asserted that he was merely following orders and he had no reason to suspect that his principal, Williams had any discriminatory motive in rejecting the plaintiffs' offer to purchase and that he knew the owner's reason for rejecting the plaintiffs' offer was an economic one. The Court finds from all of the credible evidence in the entire record and concludes the plaintiffs have proven by a preponderance of the evidence that the defendants George Humphreys, Inc., and George Humphreys individually, and Robert Maxwell Williams did discriminate against the plaintiffs as to the terms and conditions of the sale of the subject property because of their race in violation of the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3604 and 42 U.S.C. § 1982.

Linda S. Leeming died in October, 1981. She owned a condominium located at 2954 Southern Avenue in Memphis, Tennessee. Her father, Robert Maxwell Williams, lives some 250 miles away in Manchester, Tennessee. As Executor and an ultimate beneficiary of her estate, he sought to sell her former residence. The condominium is one of eight units in a small development known as Glen Eagles. Mr. Williams was advised through Mrs. Leeming's next door neighbors that the unit was worth approximately $80,000.

Learning of Mr. Williams' plans, George W. Humphreys solicited a listing for the sale of the unit. He was rejected initially since Mr. Williams through his attorney, Mr. Jerry Schwartz, was attempting to sell it without the use of an agent. The defendants had no further dealings until approximately February, 1982.

In late 1981, the estate was offered $67,000 for the purchase of the property by a local attorney (white), represented by a real estate agent, a Mrs. Latham. Pursuant to Mr. Williams' instructions, Mr. Schwartz rejected this proposal as insufficient. Another offer was submitted by Mrs. Latham on the attorney's behalf in the amount of $70,000, which called for the estate's payment of a 3% commission to Mrs. Latham. This offer was also rejected orally by Mr. Schwartz on behalf of the estate. Mr. Humphreys testified at trial that he had no knowledge of these offers until after this action had been filed.

In February, 1982, Mr. Williams agreed to list the property for sale with Mr. Humphreys. The listing price was $79,500, all cash at closing. Mr. Williams advised Mr. Humphreys that, at a minimum, he wished to net $70,000 from any sale. This mandated a sales price of $75,000 minimum, considering commissions and closing costs. After discussing a definite listing price in the 80's, Mr. Williams authorized a listing at $79,500.

When the listing was first discussed, Mr. Humphreys advised his client that the real estate market in Shelby County was depressed. He asked whether Mr. Williams would consider owner financing the sale. Mr. Williams was reluctant to do so. On inquiry from Mr. Humphreys, he did indi-

cate that he would finance for a short time (from three to five years) and would require a down payment between $25,000 and $30,000. He never committed to do so, however.

Mr. Humphreys publicized the listing. In the following weeks there were few prospects who expressed interest in the unit. Mr. Humphreys received no inquiries from outside agents about the listing until Tuesday, March 23rd.

On or about March 23, 1982, the plaintiffs, both black female citizens residing in Memphis, Tennessee, learned from the *Memphis Home Buyers Magazine,* a local publication listing homes for sale in the Memphis area, that a condominium located at 2954 Southern Avenue in Memphis was being offered for sale. They immediately contacted their real estate agent, Oliver Peyton, and asked him to inquire about the possibility of inspecting the condominium and to learn the terms of the sale.

Mr. Peyton called Mr. George Humphreys, the real estate agent for the seller of the condominium, and made arrangements for the plaintiffs to see the property. Peyton went by the offices of George Humphreys, Inc., to pick up the key to the condominium and, while there, chatted with George Humphreys about terms for the sale of the unit.

Humphreys informed Peyton that the unit was part of an estate, that the deceased owner's father lived in Middle Tennessee, that the list price for the property was $79,500 but that price was negotiable. Mr. Humphreys further stated that the first mortgage balance of approximately $16,000 could be assumed, and that the owner would consider financing the balance over a period of five years at 12% interest upon payment of a down payment of $25,000. Mr. Peyton asked Mr. Humphreys what he thought the property would go for, and Humphreys replied that it would probably sell in the mid-seventies.

Prior to the time that Peyton went to Humphreys' office to pick up the key to the condominium, Peyton and Humphreys did not know each other personally. However, Humphreys testified that he may have known prior to this meeting that Peyton was black. In any event, Humphreys certainly became aware, upon meeting Peyton, that Peyton was black, and Humphreys assumed, on that basis, that Peyton's clients were black.

Peyton met plaintiff Sandra Hobson at the condo at 2954 Southern Avenue and showed it to her. Ms. Hobson was impressed with what she saw and called her sister Clarese, who was at home, ill, and told her to get dressed and come look at the unit.

Plaintiff Clarese Hobson, then joined her sister and agent Peyton at the unit. While the three of them were there, two or three white persons, who were apparently residents of an adjacent condominium saw the plaintiffs and their agent viewing the condominium. Peyton went over and asked them how much the monthly maintenance fee was, but no conversation occurred between the plaintiffs and the adjacent residents.

After the plaintiffs completed their inspection of the condominium, they authorized Peyton to make an offer to purchase the property. That offer was reduced to writing and proposed *inter alia,* a purchase price of $69,000 to be paid as follows: $25,000 cash down payment; assumption of the first mortgage of $16,800; owner financing of the balance of $27,200 at $299.50 per month, 12% interest over 5 years. At the end of the 5 year payment period the remaining balance, known as a "balloon payment", would be payable in cash. Peyton delivered the proposed contract to the offices of Humphreys who was not in at the time, and dropped it in Humphreys' mail slot.

In deciding what offer to make for the purchase of the unit the plaintiffs, and their agent, believed the $69,000 price was probably low, but believed it to be a good faith opening offer. Their belief is supported by the testimony of a real estate appraiser, Fred Fullilove, who estimated that the fair market value of the condominium is $70,000.

Mr. Humphreys contacted Mr. Peyton, the plaintiffs' agent, shortly after receiving the plaintiffs' offer to purchase the condominium and informed him that the offer was not acceptable. Humphreys further stated that the $79,500 price was not negotiable, that the owner wanted $30,000 down, and would only consider financing over 3 years at 12% interest. Peyton testified that he was shocked by this response because he expected Humphreys to come back with a counter-offer between $69,000 and $79,500.

Even though Humphreys quoted different and higher terms to Peyton after the plaintiffs had submitted their offer, Humphreys testified that when he communicated the plaintiffs' offer to the owner, Robert Williams, he did not mention any of the terms of the offer other than the $69,000 price. In this conversation, which the owner described as "very brief", Humphreys did not mention any of the discussion he had with Peyton about a mid-seventies price nor did Humphreys ask or encourage the owner to make a counter-offer in the mid-seventies. However, Humphreys was well aware, based on previous discussions with the owner, that he was primarily interested in netting $70,000 from the sale of the condominium, an amount which would have required the property to be sold for $74,468.00. ($74,468 less a 6% real estate sales commission of $4,468 equals $70,000.)

A few hours prior to communicating the plaintiffs' offer to the owner, Humphreys had met with the owner, Mr. Williams, at the condominium, and during that conversation informed the owner that a real estate agent had shown the property the day before and he might be interested to know the agent was black. The owner, Williams, testified that he assumed therefore, that the plaintiffs were black, even though he had never met them. Thus, at the time Humphreys communicated the plaintiffs' offer to Williams, they both knew the plaintiffs were black.

After the plaintiffs' offer was rejected, Humphreys wrote a letter to the owner, dated March 26, 1982, in which he stated:

The party who made the offer the other day seemed to be disappointed that there was no counter. However, I made it clear to him if he offered the full price in cash, it would be accepted. I don't believe we are going to hear any more from him, at least for the time being.

Sandra Hobson, suspicious that the defendants might be refusing to negotiate with her and her sister because of their race asked a white co-worker, Alice Mikesell, to call Humphreys and inquire about the terms for the sale of the condominium. She did and was told by Humphreys that the purchase price was $79,500, but the figure was negotiable, that the owner would consider owner financing over 3 years at 12% interest, with $25,000 down.

After Alice Mikesell's call, the plaintiffs became convinced that Humphreys was refusing to deal with them because of their race. Therefore, they contacted the Housing Opportunities Corporation, a local non-profit agency that handles complaints of housing discrimination. As a result of the plaintiff's complaint, Housing Opportunities Corporation sent two testers to look at the condominium at 2954 Southern Avenue—one white and one black—to make inquiries about the terms of sale.

The first tester, Marilyn Wade Boyd, a black female, visited the condominium on April 10, 1982, where she met defendant Humphreys. Humphreys told Ms. Boyd that the price of the property was $79,500 and stated several times that the price was firm. He stated that the owner originally wanted to list the unit for eighty-five to ninety thousand dollars, and said that he believed the owner was firm in his asking price. Humphreys also told Ms. Boyd that a conventional loan was needed on the sale, but later added that the owner might consider a small second mortgage for a short period. No details of any kind concerning owner financing were given, however. Humphreys did not make any statement to Boyd about a down payment.

Four days after Marilyn Boyd had talked to Humphreys about the condo, the second tester, Bill Hooker, a white male, met with

Humphreys at the condominium. Hooker looked at the condo and then said, "It's about $80,000 isn't it?" Humphreys asked him how he knew that, but then immediately stated that the price was quite flexible and that he could probably purchase the unit for $77,500. Humphreys also explained that the first mortgage balance was assumable. The next day, Hooker called Humphreys again to clarify the financing arrangements and was told that the possible price was $77,500 with owner financing over 3 years at 12% with a $30,000 down payment.

Humphreys said the statements he made to the two testers regarding the terms and conditions of the sale were different only because of the relative show of interest displayed by the two testers. The Court does not accept this explanation of the defendant based on the evidence in this record. Marilyn Wade Boyd, a black tester, testified that when she inquired of Humphrey concerning the terms and conditions of the sale of the property in question, as instructed by her employer, she was told by him that the $79,500 listing price was a firm one, that a conventional loan was required and there might be available owner financing. William F. Hooker, the white tester, was told by Humphreys that the sale price was quite flexible and that an offer of $77,500 would probably' be acceptable. Hooker was also told about a first mortgage assumption, that there was a down payment required of $25,000 or $30,000 and that owner financing was likely at 12% interest. Alice Mikesell, a white friend of Sandra Hobson, when she inquired about the purchase of the property, was told by Humphreys the price was negotiable. The white prospective buyers were told the price was negotiable while black persons were told emphatically that the price was not negotiable. Hooker was definitely given more detailed information as to the terms and conditions of the sale than was given Boyd. Both testers were instructed by their employers to act as interested buyers to simulate what would have occurred if they in fact were interested in purchasing the property. The explanation given by Mr. Humphreys for

the different treatment does not convince the Court race was not a motivating factor. His actions indicate he intended to discourage blacks from making offers while he actively encouraged white offers. As quoted by the Court in *McHaney v. Spears,* 526 F.Supp. 566 (W.D.Tenn.1981), a court should remember:

> Recent cases make clear that the statutes prohibit all forms of discrimination, sophisticated as well as simple-minded, and thus disparity of treatment between whites and blacks, burdensome application procedures, and tactics of delay, hindrance, and special treatment must receive short shrift from the courts . . . [t]he courts will look beyond the form of a transaction to its substance and proscribe practices which actually or predictably result in racial discrimination, irrespective of defendant's motivation.

*McHaney, supra* at 573.

Defendant's practices, as applied, adversely affected the black plaintiffs. The Court finds defendant's stated reasons are pretextual. *Harper v. Hutton,* 594 F.2d 1091 (6th Cir.1979). In *Harper,* the plaintiffs, young black college students were refused rental of an apartment near the Vanderbilt University campus. The landlord stated that he refused to rent to the plaintiffs because they were scholarship students on a tight budget and he did not think that they could make the rental payments. The landlord also stated that since the plaintiffs would have to break their lease to move he did not feel that they would make good tenants. The Court of Appeals for the Sixth Circuit after reviewing the entire record held that the landlord's business judgment excuse was a pretext. In this case, Humphreys asserts that he could only take offers that complied with his listing agreement. However, the evidence indicates that Mr. Humphreys knew Mr. Williams would have accepted less than the stated listing price. Mr. Humphreys was not firm in stating to white prospective buyers that the listing price was fixed. On the other hand, he drove this point home to prospective black purchasers to discourage them from making any subsequent offers.

■ The sequence of events clearly shows that race was a factor in Humphreys' dealings with the plaintiffs. Mr. Humphreys stated to the plaintiffs different and higher terms than he stated to whites. He offered different and more favorable terms to whites after rejection of the plaintiffs' offer. All of the above findings of fact, coupled with the fact that Mr. Humphreys has never sold or listed a home to a black person, leads this Court to conclude that George Humphreys, Inc., George Humphreys individually and Robert Maxwell Williams violated 42 U.S.C. § 3604 and 42 U.S.C. § 1982. The corporate defendant is liable for the tortious actions of its agent, because the actions of Humphreys were motivated to inure to the benefit of the corporation.

The condominium at 2954 Southern Avenue is part of an eight-unit condominium complex known as Glen Eagles Condominiums. It has two bedrooms and approximately 1,608 square feet. The condominiums were built in 1967 by defendant George Humphreys and others, and Humphreys handled the initial sales of the units. The complex has never had a black resident or owner.

Defendant, George Humphreys, Inc., is a corporation engaged in residential real estate sales. George Humphreys is the principal shareholder. The corporation has contracts with five affiliate real estate brokers, all white, who share their commission with the corporation.

Defendant George Humphreys is a male white, 69 years of age, who has been a licensed real estate broker since 1964. During his career as a real estate broker he has never personally sold a home to or for a black person. Humphreys solicited the contract to sell the Glen Eagles condominium from the owner, as early as November, 1981. However, the owner first attempted to sell the property on his own. After being unsuccessful, he contracted with Humphreys to sell the unit in February, 1982.

Defendant, Robert Maxwell Williams, is a retired business executive residing in Manchester, Tennessee. He is the executor and primary beneficiary of the estate of Linda S. Leeming, his deceased daughter, from which he inherited the condominium at 2954 Southern Avenue.

Clarese Hobson testified that had negotiations for the property continued she and her sister were willing to pay possibly as much as $75,000, with some owner financing, for the condominium. However, one of her primary concerns was the amount of the monthly note, which she wanted to keep below $600.00. Assumption of the first mortgage would have entailed payment of a $280.00 monthly note, thus requiring payments on the equity to be less than $320.00 in order to keep the total payments below $600.00 per month. Sandra Hobson testified that she would have gone as high as $74,000 for the purchase of the unit, and possibly as high as $75,000, with some owner financing.

Defendant, Robert Maxwell Williams, owner of the condominium, testified that he was willing to sell the property for an amount that would net him $70,000 or $74,-468 (as shown above). He further testified that he would have financed the equity, assuming a financially responsible buyer, upon payment of a $25,000 or $30,000 cash down payment, over three years at 12% interest, so long as the payments exceeded the interest. (Thus, $74,468 less $25,000 down less $16,800 first mortgage balance equals $32,668 as the amount to be financed. Interest on $32,668 at 12% for one month would be $326.68).

The Court finds that, had there not been a racially motivated refusal to negotiate by Mr. Humphreys, the plaintiffs would have reached an agreement with the owner for the purchase of the condominium on the following possible terms:

a) Total Price—$74,500

b) Assumption of first mortgage balance of $16,800

c) Cash down payment of $25,000

d) Owner financing of the balance of $32,700 at 12% interest over 3 years with payments of $350.00 per month;

e) All other terms of the sale would be as set forth in Exhibit 1, the initial offer by plaintiffs.

This finding is consistent with the testimony of the parties and the testimony of Mr. Fullilove, the appraiser, that the condominium had a fair market value of $70,000, and possibly a little more with owner financing.

The Court has jurisdiction of this case under 42 U.S.C. § 3601 *et seq.;* 42 U.S.C. § 1982; and 28 U.S.C. § 1343(3). The Fair Housing Act, 42 U.S.C. Sections 3601–3631 (1976) makes it unlawful for any person to refuse to sell or otherwise make unavailable a dwelling to any person because of race. Section 3604(a) of 42 U.S.C., provides in pertinent part:

[I]t shall be unlawful—(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.

Housing discrimination is also prohibited by the Civil Rights Act of 1866, 42 U.S.C. Section 1982 which provides as follows:

All citizens of the United States shall have the same right in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

■ One method of deciding whether the defendants in this case violated either of these statutes is to analyze the evidence in accordance with certain burden shifting principles. First the plaintiff must establish a prima facie case of discrimination. If the plaintiff successfully proves a prima facie case, the burden shifts to the defendants to present evidence that their actions were not motivated by consideration of race. Finally, if the defendants articulate non-racial reasons for their actions, the plaintiffs are entitled to prove that the articulated reason is a mere pretext, or not the true reason, for defendants' actions. *See Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct.

1089, 67 L.Ed.2d 207 (1981); *Robinson v. 12 Lofts Realty, Inc.,* 610 F.2d 1032 (2d Cir. 1979).

■ The plaintiffs may establish a *prima facie* violation of Title VIII and Section 1982 by showing:

1) that the plaintiffs are members of a racial minority;

2) that plaintiffs applied for or were qualified to rent or purchase the property;

3) that plaintiffs were rejected; and

4) that the opportunity to purchase the property remained open.

*McHaney v. Spears,* 526 F.Supp. 566 (W.D. Tenn.1981). There is no doubt that plaintiffs proved a *prima facie* case of discrimination. First, it is undisputed that plaintiffs are black. Second, they applied for and were qualified to purchase the condominium in question. Finally, plaintiffs' offer was rejected, and the opportunity to purchase the vacant condominium remained open.

Having proved a *prima facie* case, the burden shifts to the defendants to come forward with evidence to show non-racial motivations for their actions. *Robinson v. 12 Lofts Realty, Inc., supra.* Here, the defendants' articulated reason for rejecting the plaintiffs was that the plaintiffs did not offer $79,500 to purchase the condominium.

The defendants' articulated reason was not the true reason for their actions, however. Humphreys' failure to even discuss a counter-offer with the owner, Williams, is inexplicable. When Humphreys communicated plaintiffs' offer to Williams he knew that Williams only wanted to net $70,000 and he knew that he had discussed a mid-seventies price with Oliver Peyton. If Humphreys was interested in selling the unit to the plaintiffs, it is inconceivable that he would not have discussed a counter-offer with the owner, either in his phone conversation with the owner or the letter that he wrote to the owner. The conclusion is thus inescapable that Humphreys did not want to deal with the plaintiffs. The evidence

further established that the defendants refused to negotiate with the plaintiffs and quoted different terms to plaintiffs than were quoted to white persons. When the plaintiffs made a written offer to purchase the condominium, the defendants not only rejected their offer, but countered with higher terms than had been originally stated. However, when Alice Mikesell, a white tester called to inquire about the property, the original terms were quoted again with one exception—the period for owner financing was given as 3 years rather than 5. Furthermore, when Bill Hooker, a white tester, approached defendant Humphreys about the property and even suggested a sale price of $80,000, Humphreys immediately told him he could probably get it for $77,500. This testimony was undisputed by Humphreys. In short, the defendants' articulated reasons for their actions are not worthy of credence. Therefore, the plaintiffs have met their burden of proving intentional racial discrimination.

■ In the circumstances of this case, it is really not necessary for the Court to analyze the evidence in terms of the burden shifting principles of *Texas Department of Community Affairs v. Burdine, supra,* because the evidence clearly and directly shows that the defendants refused to negotiate with the plaintiffs on the same basis as with white persons. Proof of discriminatory motive can, in some situations, "be inferred from the mere fact of difference in treatment." *Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). Likewise, "[t]he specific sequence of events leading up to the challenged decision may also shed some light on the decision maker's purposes . . ." *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 267, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977). Here, defendant Humphreys' failure to discuss a counter-offer with the owner, the differing terms offered to white persons, and countering plaintiffs' offer with higher terms coupled with Humphreys' history of never having sold a home to or for a black person inescapably leads to a strong inference of racial animus.

■ All of the plaintiffs' dealings were with the defendant George Humphreys. However, Humphreys was acting as an agent for the defendant Robert Maxwell Williams. After reviewing the evidence, the only rational conclusion is that Williams was involved in the discriminatory actions of Humphreys. Even if Williams was not directly involved in the discriminatory actions of Humphreys, he knew and acquiesced in the actions of his agent that were within the scope of the agent's authority. He is, therefore, liable for the acts of his agent and jointly liable for any compensatory damages awarded. The actions and statements of Humphreys are attributable to Williams. Williams' duty to comply with the law is a non-delegable one. *Marr v. Rife,* 503 F.2d 735, 741–742 (6th Cir.1974).

Proof in this record shows that Mr. Williams knew of the discriminatory actions taken by Mr. Humphreys. This finding is substantiated by the contents of a letter, dated March 26, 1982, wherein Mr. Humphreys informed Mr. Williams:

> The party who made the offer the other day seemed to be disappointed that there was no counter. However, I made it clear to him if he offered the full price in cash, it would be accepted. I don't believe we are going to hear any more from him, at least for the time being.

Rhetorically, the Court has asked itself repeatedly, what other inference than knowledge of racial discrimination can be drawn from this very damaging statement. The answer is always the same—none.

Furthermore, Mr. Williams had reasoned the prospective purchasers were black people. Mr. Humphreys testified he informed Mr. Williams the real estate agent, Peyton, was black. Mr. Williams testified he assumed plaintiffs were black though he had never met them.

The Court notes the two plaintiffs are educated and articulate young women. Both hold very responsible jobs. Clarese Hobson is senior accountant at Memphis Housing Authority and earns a salary of

$21,746 per year. Her sister, Sandra Hobson, holds a responsible position with the Memphis office of the Equal Employment Opportunity Commission. Her salary is in excess of $26,000 per year. Sandra Hobson testified in substance that this form of racial discrimination greatly upset her, that she had worked hard to get where she is— and yet she suffered racial discrimination by white persons, who did not even know her, just because she is a black person.

 Having found an intentional violation of the Fair Housing Act and 42 U.S.C. Section 1982, the Court must consider the appropriate relief. With regard to the question of compensatory damages, the proof establishes the plaintiffs are entitled to recover damages for humiliation and mental anguish resulting from the defendants' actions. The plaintiffs were victims of intentional racial discrimination. Their testimony indicates that they were humiliated, upset and distracted at work as a result. This is to be expected, for as the Supreme Court recognized in *Brown v. Board of Education,* 347 U.S. 483, 494, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954):

> [racial segregation] generates a feeling of inferiority as to [the black school children's] staying in the community that may affect their hearts and minds in a way unlikely ever to be undone.

Although it is difficult to measure emotional and mental distress in monetary terms, an award of $10,000 (plus $10,000 punitive damages) has been held not to be unreasonable in a housing discrimination case. *Parker v. Shonfeld,* 409 F.Supp. 876 (N.D.Cal. 1976). *See also, Buxton v. Patel,* 595 F.2d 1182 (9th Cir.1979); ($7,500 compensatory and $7,500 punitive damages); *Bradley v. John M. Brabham Agency, Inc.,* 463 F.Supp. 27 (D.S.C.1978), ($7,000 compensatory and $500 punitive damages). The Court therefore awards *each* plaintiff compensatory damages for humiliation and mental anguish in the amount of $5,000 with the defendants liable jointly and severally for the total $10,000 award.

 The plaintiffs are also entitled to an award of punitive damages. As this Court has stated:

> The rules in civil rights cases for recovery of punitive damages is that the defendant must have exhibited oppression, malice, gross negligence, willful, or wanton misconduct, or a reckless disregard for the civil rights of the plaintiff.

*Harris v. Richards Manufacturing Co.,* 511 F.Supp. 1193, 1206 (W.D.Tenn.1981); reversed in part on other grounds, 675 F.2d 811 (6th Cir.1982). It also should be kept in mind that the basic reason for awarding punitive damages "is not merely to cause the wrongdoer to suffer, but to deter wrongdoing; 'to serve as an example or warning to others not to engage in such conduct.' ..." *Shimman v. Frank,* 625 F.2d 80, 101–2 n. 44 (6th Cir.1980). Given the strong public policy against housing discrimination, the deterrence factor is not to be overlooked in determining the amount of punitive damages. Here, the proof establishes an *intentional* violation of the plaintiffs' civil rights by defendant Humphreys. Thus, he is guilty of willful misconduct. Therefore the Court assesses punitive damages against defendant George Humphreys in the amount of $1,000 for Sandra Hobson and $1,000 for Clarese Hobson.

 Having determined that the defendants refused to deal with the plaintiffs because of their race, this Court has the "power as well as the duty to 'use any available remedy to make good the wrong done.'" *Moore v. Townsend,* 525 F.2d 482, 485 (7th Cir.1975), quoting from *Sullivan v. Little Huntington Park, Inc.,* 396 U.S. 229, 239, 90 S.Ct. 400, 405, 24 L.Ed.2d 386 (1969). The Court has previously determined the terms of sale that would have most likely been agreed upon, had negotiations continued. Therefore, this Court orders that the defendants shall offer for sale to the plaintiffs the condominium at 2954 Southern Avenue, Memphis, Tennessee, on the terms and conditions as set forth in this opinion.

The Court directs the attorneys for the parties to meet within ten (10) days from the date of this opinion for the purpose of finalizing an appropriate Order terminating this case in accordance with the terms here-

in set forth. Pending the outcome of that meeting, the Court will retain jurisdiction of the case relating to costs and attorneys' fees. The injunction heretofore entered will continue in effect pending entry of a final Order, all of which is

## ON ATTORNEY'S FEES AND COSTS

Plaintiffs' attorney moves the Court to award him attorney's fees and to award plaintiffs costs in the above styled case. For reasons stated herein, the Court grants the motion.

This is a fair housing case which was brought pursuant to 42 U.S.C. § 1982 and Title VIII of the Fair Housing Act of 1968, 42 U.S.C. § 3601 *et seq.* An award of attorney's fees in such a case is authorized under the Civil Rights Attorney's Fee Award Act, 42 U.S.C. § 1988 as well as the Fair Housing Act, 42 U.S.C. § 3612(c). *Northcross v. Board of Education of Memphis City Schools,* 611 F.2d 624 (6th Cir. 1979), *cert. denied,* 447 U.S. 911, 100 S.Ct. 3000, 64 L.Ed.2d 862 (1980), established the appropriate standards for this Court to follow in assessing the amount of attorney's fee award in a fair housing case.

 The Sixth Circuit recently held in *Price v. Pelka,* 690 F.2d 98 (6th Cir.1982), where a plaintiff in a fair housing case prevailed on the merits of her claim based on both 42 U.S.C. § 1982 and the Fair Housing Act, 42 U.S.C. § 3601 *et seq.,* she was entitled to an award of attorney's fees. The Court stated the more liberal attorney fee provision of 42 U.S.C. § 1988 should be applied rather than the restrictive provision in 42 U.S.C. § 3612(c). 42 U.S.C. § 3612(c) allows the district court to award fees only if it finds plaintiff, the prevailing party, is financially unable to assume these fees. 42 U.S.C. § 1988 allows a prevailing plaintiff to recover attorney's fees without the district court having to determine plaintiff is unable to pay. *Id.* at 101. The Court further stated:

> Although the language of section 1988 is permissive, the court must exercise its discretion consistent with the congressional purpose underlying this statute.

In enacting the Civil Rights Attorney's Fees Awards Act of 1976, Congress intended for prevailing parties to ordinarily recover attorneys fees. Congress expressly stated that the prevailing party "should ordinarily recover an attorney's fee award unless special circumstances would render such an award unjust." *Id.* at 101.

A primary purpose of the Civil Rights Attorney's Fees Act is to promote private enforcement of civil rights laws. *Id.*

Therefore the Court awards the sum of $5,962.50 to plaintiffs' attorney as reasonable fees. Plaintiffs' attorney has submitted a sworn affidavit which states the total number of hours required to prepare this case for trial and for the actual trial of the case was 79.5 hours. The Court finds this compilation of hours to be reasonable. A reasonable hourly rate for plaintiffs' counsel is $75.00 per hour. The Court also awards plaintiffs costs of $783.55. Plaintiffs are the prevailing parties.

It is SO ORDERED this 6th day of December, 1982.